## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| James Van Raden, | Civil No. 13-2283 (DWF/LIB) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| Steven Larsen, individually and in his capacity as a police officer for the City of Moorhead, MN; Matthew Wychor, individually and in his capacity as a police officer for the City of Moorhead, MN; Daniel Birmingham, individually and in his capacity as a police officer for the City of Moorhead, MN; | |
| Defendants. | |

_____

Celeste E. Culberth, Esq., and Leslie L. Lienemann, Esq., Culberth & Lienemann, LLP, counsel for Plaintiff.

Jason M. Hiveley, Esq., Iverson Reuvers Condon, LLC, counsel for Defendants.

_____

## INTRODUCTION

This matter is before the Court on a Motion for Summary Judgment brought by Plaintiff James Van Raden ("Van Raden") (Doc. No. 12) and a Motion for Summary Judgment brought by Defendants Officer Steven Larsen ("Officer Larsen"), Officer Matthew Wychor ("Officer Wychor"), and Officer Daniel Birmingham ("Officer Birmingham") (together, the "Officers" or "Defendants") (Doc. No. 26). For the reasons

set forth below, the Court denies Van Raden's motion and grants in part and denies in part Defendants' motion.

## BACKGROUND

At approximately 1:00 p.m. on August 23, 2011, Officers Larsen, Wychor, and Birmingham answered a dispatch to seventy-five-year-old Van Raden's home to conduct a welfare check on the report of a suicidal male. (Doc. No. 18 ("Wychor Aff.") ¶ 2, Ex. 2 ("Wychor Police Report") at ¶ 1; Doc. No. 20 ("Larsen Aff.") ¶ 2, Ex. 1 ("Larsen Police Report") at ¶ 1; Doc. No. 21 ("Birmingham Aff.") ¶ 2, Ex. 3 ("Birmingham Police Report") at ¶ 1.) The dispatch was made after Van Raden called the Rape and Abuse Crisis Center Hotline ("Crisis Hotline") and expressed that he had nothing to live for. (Wychor Police Report at ¶ 1; Larsen Police Report at ¶ 1; Birmingham Police Report at ¶ 1.)

Van Raden acknowledged that he called the Crisis Hotline (Doc. No. 17 ("Hiveley Aff.") ¶ 2, Ex. 6 ("Van Raden Dep.") at 8-9.) During the call, Van Raden asked something to the effect of: "What do you have to do to get relief? Do you have to kill yourself before you get relief from this crazy person that wants to kill me and from the police that don't make any report or help when this guy is harassing me?" (*Id*. at 21-22.) Van Raden testified that he called the Crisis Hotline to complain about a tenant who was harassing him and that the police were not responding. (*Id*. at 9, 22.) Van Raden maintains that there was a misunderstanding with the Crisis Hotline employee who told police he was suicidal. (*Id*. at 59.)

The record demonstrates that the responding Officers were familiar with Van Raden, knew Van Raden did not like law enforcement, and knew that Van Raden had recently been arrested for Second Degree Assault and Felony Terroristic Threats following a victim's report that Van Raden had threatened the victim with a firearm. (Wychor Police Report ¶ 1; Larsen Police Report ¶ 1; Birmingham Police Report ¶ 1.)

Officer Wychor was the first to arrive at Van Raden's house. (Doc. No. 15 ("Lienemann Decl.") ¶ 7, Ex. 6 ("Audio Recording");[1] Wychor Report ¶ 2.) Officer Wychor knocked on the door, and Van Raden answered. (Audio Recording.) Van Raden then walked into his office and sat in a chair. (Van Raden Dep. at 26.) Officer Wychor followed.[2]

At the outset, Officer Wychor indicated that Van Raden was not under arrest and that Officer Wychor was there on a "welfare check." (Audio Recording.) Officer Wychor asked Van Raden about his current condition, and Van Raden responded that he was "not doing too good" and stated that the police wanted to "kill him off." (Audio Recording; Van Raden Dep. at 26.) Officer Wychor denied that the police wanted to kill him and indicated that it was important that Van Raden talk to someone. (Audio Recording.) Van Raden cursed and expressed his fear and distrust of the police throughout the encounter. (*Id.*) During his conversation with Officer Wychor,

---

[1] Officer Wychor made a digital audio recording of the entire encounter with Van Raden. (Wychor Police Report at ¶ 2.)

[2] Van Raden asserts that Officer Wychor pushed him into his house (Van Raden Dep. at 43), but nothing in the record supports this assertion.

Van Raden told the Officers that a tenant was harassing him.[3]  (*Id*.)  Van Raden also stated that, due to his current circumstances, life was not worth living; "what is there to live for?"; and "I don't [want to live] I would rather do myself in by taking a whole bunch of fucking drugs, where I would just die, rather than getting shot at."  (*Id*.)  Van Raden repeatedly complained about prior incidents with the police.  (*Id*.)  Officer Wychor explained that because of the way Van Raden was talking, he would have to go talk to a doctor.  (*Id*.)  Van Raden became increasingly agitated and stated that he did not want to leave with the officers.  (*Id*.)

Officer Wychor reiterated that Van Raden had to go to the hospital and tried to persuade Van Raden to walk out to the ambulance waiting outside.[4]  (*Id*.)  Van Raden refused and stated that it was because he was scared that he was going to be arrested and injured.  (*Id*.)  Officer Wychor reassured Van Raden that Van Raden was not under arrest.  (*Id*.)  In the meantime, Officers Larsen and Birmingham arrived and joined Officer Wychor and Van Raden in the office.[5]

---

[3]  Van Raden commented that he was going to "swing and knock the head off" of the tenant that was causing him problems and allegedly pointed towards a sword lying on his desk.  (Audio Recording; Wychor Dep. at 47.)  Officer Wychor positioned himself so that he was standing in between Van Raden and the desk on which the sword was lying.  (Wychor Dep. at 47.)

[4]  Moorhead Fire Department and an ambulance arrived at the scene and waited outside.  (Birmingham Report ¶ 2.)

[5]  Officer Birmingham first searched the main level of the house to determine if there were other people present.  (Doc. No. 28, Hively Supp. Aff. ¶ 4, Ex. 3 ("Birmingham Dep.") at 33.)

Following Van Raden's continued refusal to seek medical treatment, Officer Larsen explained to Van Raden that he would need to go to the hospital and that he did not have a choice in the matter. (*Id.*) Specifically, he said: "You don't have a choice in the matter. You are going to the hospital; either you cooperate and walk with us or we will forcefully take you." (*Id.*; Larsen Police Report ¶ 4.) Van Raden said "no" and told the Officers to "get the fuck out of my house" and "you are gonna have to fight me and knock me out." (Audio Recording.) Officer Wychor stated that they did not want to fight Van Raden, but that Van Raden would need to leave his house to be medically cleared. (*Id.*) Office Wychor said "let's walk outside" and Van Raden said "no." (*Id.*) Van Raden asked for his lawyer. (*Id.*)

Officer Larsen drew his Electronic Control Weapon ("taser") and stated: "I don't want to have to tase you right now, but I will do it." (*Id.*) Van Raden responded: "If you tase me, I'll probably die." (*Id.*)[6] Van Raden claims he made the Officers aware of various medical ailments including the need for insulin, arthritis pain, and heart problems, including the fact that he had stents in his heart and high blood pressure. Van Raden repeated on numerous occasions that he would likely die if he was tasered, and Van Raden became more agitated and cursed when the taser was pointed at him. (Video Recording.) Initially Officer Wychor reassured Van Raden that the taser was just being used to record the incident and that the Officers were not planning on using it. (*Id.*)

---

[6] Officer Larsen began recording the incident with a digital camera on his taser. (Lienemann Decl. ¶ 2, Ex. 1 ("Video Recording").) His video begins in Van Raden's office while Van Raden is seated in his chair. (Hively Supp. Decl. ¶ 2, Ex. 1 ("Larson Dep.") at 38-39; Video Recording.)

The Officers continued their requests for Van Raden to accompany them to the ambulance and Van Raden continued to refuse. (*Id*.) Van Raden remained seated in his office chair. (*Id*.) Officers Wychor and Birmingham grabbed Van Raden's arms and legs to try to physically lift him out of the chair, but Van Raden would not cooperate. (*Id*.) Officer Larsen told Van Raden to let go of the chair or else he would use the taser. (*Id*.) Officer Larsen then deployed his taser in "drive-stun" mode to Van Raden's right shoulder area. (*Id*.; Hiveley Supp. Aff. ¶ 2, Ex. 1 ("Larsen Dep.") at 41-43.) Van Raden screamed and released his grip on the chair. (*Id.*) However, Van Raden remained seated and Officers Wychor and Birmingham again attempted to lift him out of the chair. (*Id.*) Van Raden repeated that he wanted to be left alone. (*Id.*) As Officers Wychor and Birmingham attempted to lift Van Raden out of the chair, Officer Larsen testified that Van Raden kicked at him. (Larsen Dep. at 57-58.) The Officers stated in their police reports that Van Raden kicked at Officer Larsen. (Wychor Police Report at ¶ 4; Larsen Police Report at ¶ 5; Birmingham Police Report at ¶ 9.) Van Raden testified that he did not kick the Officers and that the Officers lifted his leg while attempting to remove him from the chair. (Van Raden Dep. at 27, 52.) Then, Officer Larsen aimed the laser of the taser device on Van Raden's chest and deployed his Taser device in "probe" mode. (Video Recording; Larsen Dep. at 41-43.) The taser's two prongs made contact with Van Raden's sternum and stomach and the electric discharge lasted for the standard five second deployment. (*Id.*; *see also* Lienemann Decl. ¶ 6, Ex. 5 ("Taser Photos").)

Van Raden screamed and appeared to be in pain. (Video Recording.) Officer Larson stated "I will do it again if you resist." (Audio Recording.)

The Officers attempted to handcuff Van Raden, but Officer Wychor stated that they would not handcuff him if he stood up and walked out. (Video Recording.) Van Raden began complaining of heart pain and arm pain. (*Id*.) Van Raden attempted to walk with the assistance of the Officers, but fell to the floor and complained of chest pain and cursed at Defendants. (*Id*.) After about two minutes on the floor, Officer Wychor pulled Van Raden by his arms and slid him onto a backboard to take him to the ambulance. (*Id*.) During this time, Van Raden cursed repeatedly at the Officers, but was not violent towards them. (*Id.*) The taser probes were photographed and removed from Van Raden's torso. (Wychor Police Report at ¶ 6; Larsen Police Report at ¶ 7; Birmingham Police Report at ¶ 11; s*ee also* Taser Photos.)

Van Raden was then transported by ambulance with Officer Wychor to Essentia Hospital in Fargo, North Dakota. (Wychor Police Report ¶ 7; Larsen Police Report ¶ 5; Birmingham Police Report ¶ 12; Van Raden Dep. at 28.) Van Raden was medicated en route because he continued to be verbally abusive, swore loudly, and made suicidal comments to the paramedics. (Wychor Police Report ¶ 7.) Once at the hospital, Van Raden was turned over to medical staff for evaluation. (*Id*.)

Van Raden asserts three claims against Defendants: (1) excessive force (Count One); (2) deliberate indifference to serious medical needs (Count Two); and (3) false arrest (Count Three). (Doc. No. 1, Compl. ¶¶ 51-63.) Van Raden moves for summary

judgment on Counts One and Two.  (Doc. No. 12.)  Defendants move for summary judgment on all counts.  (Doc. No. 26.)  The Court considers both motions below.

## DISCUSSION

### I.     Summary Judgment Standard

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party.  *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank*, 92 F.3d at 747.  The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial.  *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).  A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II. Qualified Immunity

Defendants submit that they are entitled to qualified immunity on Van Raden's claims. The doctrine of qualified immunity protects state actors from civil liability when their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The defense provides "ample room for mistaken judgments" as it protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 343 (1986). To overcome the defense of qualified immunity, a plaintiff must show that: (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation. *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010) (citation omitted). The Court has discretion to decide which qualified immunity prong to consider first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). In determining whether the constitutional right was clearly established at the time of the conduct, the Court must ask whether the contours of the applicable law were "'sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

### A. False Arrest/Unlawful Seizure

Defendants move for summary judgment on Count Three of Van Raden's Complaint. Van Raden asserts that he was unlawfully detained and unreasonably seized

9

in violation of his Fourth Amendment rights. Van Raden argues that at the time the Officers seized him, they were under no time pressure, made no effort to obtain assistance of community or mediation services, and did not use de-escalation techniques for dealing with individuals with mental health issues. Moreover, Van Raden contends that there was no indication that he had committed or was about to commit a crime or that he intended to harm anyone. Defendants submit that the Officers detained Van Raden as part of their community caretaking function and that their decision was reasonable in light of their belief that Van Raden was in danger of injuring himself.

The Fourth Amendment prohibits unreasonable seizures. *Graham v. Connor*, 490 U.S. 386, 394-95 (1989). In addition, the Eighth Circuit has recognized the existence of the community caretaking function of police officers. *Winters. v. Adams*, 254 F.3d 758, 763 (8th Cir. 2001). Pursuant to that function, police officers are permitted, and even expected, to ensure the safety of the public or an individual, regardless of suspected criminal activity. *Id*. (citing *King v. United States*, 990 F.2d 1552, 1560-61 (10th Cir. 1993)). In exercising this function, a police officer may have occasion to seize a person. *Id*.

It is apparent to the Court that the Officers here were acting pursuant to their community caretaking function. The record demonstrates that the Officers responded to a request to check the welfare of a suicidal male.[7] To their knowledge, Van Raden called the Crisis Hotline and was deemed a suicide risk. Once the Officers arrived, Van Raden

---

[7] Van Raden claims he was not suicidal. However, the Court looks to whether the Officers reasonably believed him to be so.

became agitated and mentioned that he did not want to live and that he could take pills to end his life. Further, Van Raden also refused to comply with the Officers' repeated requests that he voluntarily leave the house and get into a waiting ambulance. These facts support the Officers' reasonable belief that Van Raden was at risk of harming himself. Moreover, taking the facts in the light most favorable to Van Raden, no reasonable juror could conclude that the Officers' decision to take Van Raden into custody to receive appropriate mental health care was unreasonable. Therefore, there was no constitutional violation, and the Officers are entitled to qualified immunity on Count Three.

### B.   Excessive Force

Van Raden asserts a claim of excessive force against the Officers and moves for summary judgment on the claim. In particular, Van Raden argues that a reasonable officer on the scene would not have used a taser. In support of his claim, Van Raden argues that there was nothing to indicate that the Officers were concerned for their safety, that the Officers were not under any particular time pressure, and that the Officers were merely faced with a "cantankerous elderly man who was sitting in a rolling chair." (Doc. No. 14 at 8.) In fact, Van Raden asserts that the Officers escalated the situation by raising their voices and threatening to use a taser. Van Raden points out that there were three Officers present, Van Raden was not suspected of having committed a crime, Van Raden did not threaten the Officers, and it was clear that Van Raden had not harmed himself. Van Raden maintains, that at the time Defendants tasered him in 2011, the law

11

was sufficiently clear to inform a reasonable officer that it was unlawful to tase a nonviolent person who was not suspected of a crime, was not fleeing, and was not being placed under arrest.[8]

Defendants assert that they are entitled to qualified immunity because the Officers' use of the taser on Van Raden did not violate his clearly established rights because he was physically and actively resisting being detained throughout the welfare check.

The Court evaluates excessive force claims under an objective-reasonableness test. *Graham*, 490 U.S. at 394-95. In determining whether the use of force is "reasonable" under the Fourth Amendment, a court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against the government's interests at stake. *Id*. at 396 (citation omitted). The reasonableness of the use of force must be judged from the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *See id*. The proper application of the Fourth Amendment "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or

---

[8] Van Raden also points to a Moorhead Police Department policy discouraging the use of taser weapons on elderly persons. (Doc. No. 15 ("Lienemann Decl.") ¶ 8, Ex. 7 ("The use of the TASER device on [elderly individuals] should generally be avoided unless the totality of the circumstances indicates that other available options reasonably appear ineffective or would present a greater danger to the officer, the subject or others, and the officer reasonably believes that the need to control the individual outweighs the risk of using the device."). (*Id*. at § 309.5.2.) Van Raden asserts that it was unreasonable for the Officers to fail to follow their own policy.

attempting to evade arrest by flight." *Id*. The Court's decision here turns on the question of whether, taking the facts in the light most favorable to the non-moving party, Van Raden was subjected to excessive force so as to violate a constitutional right and, if so, whether that right was clearly established at the time.

A review of the relevant law reveals that the use of a taser can be objectively reasonable where there is a threat to an officer's safety or where a person poses a substantial harm to themselves. *See McKenney v. Harrison*, Civ. No. 09-129, 2010 WL 560891, at *7-8 (D. Neb. Feb. 10, 2010), *aff'd*, 635 F.3d 354 (8th Cir. 2011) (holding officer entitled to qualified immunity for using a taser on an unarmed person to prevent the person from lunging at a second-story window). With respect to the facts of this case, the parties focus on two cases: *Brown v. City of Golden Valley*, 574 F.3d 491 (8th Cir. 2009) and *De Boise v. TASER, Int'l*, 760 F.3d 892 (8th Cir. 2014).[9]

In *Brown*, the Eighth Circuit found that police officers were not entitled to qualified immunity on an excessive force claim after using a taser during an arrest. In *Brown*, the officers used a taser on a female passenger in a car whose husband had been pulled over. *Id*. at 494. The officers suspected the plaintiff of a misdemeanor open bottle violation. *Id*. at 496. The Eighth Circuit explained that the plaintiff was sitting in the car and talking on her cell phone (to a 911 operator), was not fleeing or actively resisting, and that she "posed at most a minimal safety threat" to the officers. *Brown*, 574 F.3d at 497-98. At most, the plaintiff was refusing to obey orders to end her phone call. *Id*.

---

[9] The Court notes that a petition for certiorari in *De Boise* was filed on January 8, 2015.

at 499.  The Court noted that there was "nothing to indicate that [the officer] was faced with the need to make any split-second decisions, nor can the circumstances be fairly described as constituting a 'tense, uncertain, and rapidly evolving' situation." *Id*. at 497.

In *De Boise*, the Eighth Circuit held that the repeated use of a stun gun on an arrestee (De Boise) on July 7, 2008 did not violate the arrestee's clearly established rights.  De Boise suffered from schizophrenia and, on the night of his arrest, became delusional and physically aggressive.  *Id*. at 894.  Five police officers arrived on the scene, at which time De Boise's mother informed the officers that she had a firearm in the house and that her son was schizophrenic.  *Id*. at 894-95.  The officers heard loud noises from inside the house, including screaming, glass breaking, and heavy furniture being thrown, after which De Boise exited the house naked and referred to himself as God.  *Id*. at 895.  De Boise initially complied with instructions to lie face down on the ground, but when an officer approached, De Boise jumped to his feet, clenched his fists, and glared at an officer.  *Id*.  The officers instructed De Boise several times to lie down, but De Boise refused.  *Id*.  The officers tasered De Boise, but he continued to struggle and ignore commands.  *Id*.  The officers tasered De Boise multiple times and injected him with a sedative.  *Id*. at 895-96.  De Boise suffered cardiac arrest and died.  *Id*. at 896.  The Eighth Circuit explained:

> Although we have determined that non-violent, non-fleeing subjects have a clearly established right to be free from the use of tasers, [] we have yet to determine whether a violent subject, acting aggressively toward officers, has a clearly established right to be free from multiple tasings. . . . Indeed, in 2008, case law related to the use of tasers was still developing. . . . And, Appellants point to no previous case that could be

14

>said to have clearly established the unconstitutionality of the officers'
>actions here.  Accordingly, the state of the law would not have placed "an
>officer on notice that he must limit the use of his taser in certain
>circumstances, even though the subject continues to struggle and resist."

*De Boise,* 760 F.3d at 897 (citations omitted).

As a threshold matter, the Court notes that neither Officer Wychor nor Officer Birmingham used a taser.  Moreover, in viewing the record, including the video and audio tapes of the incident, none of their actions could be deemed unreasonable by a juror.  Therefore, the Court holds that both Officers Wychor and Birmingham are entitled to qualified immunity on Van Raden's excessive force claim.  Count One is dismissed to the extent that is asserted against Officers Wychor and Birmingham.

The only remaining issue on Van Raden's excessive force claim is whether Officer Larsen's use of the taser, as a means to gain Van Raden's compliance, violated Van Raden's constitutional rights and, if so, whether those rights were clearly established.  Based on the record before it, and viewing the facts in the light most favorable to the nonmoving party, the Court concludes that fact issues exist as to the reasonableness of the use of the taser by Officer Larsen on Van Raden.  In particular, a reasonable juror could conclude that Officer Larsen's use of the taser was unreasonable. Here, Van Raden was the subject of a "welfare check" and was obviously in a mentally fragile state, and while Van Raden was resisting being removed from his home and was verbally expressing his anger and frustration, he was not violent towards the Officers or

attempting to flee, and Van Raden did not have a weapon.[10]  In addition, while Van Raden stated that life was not worth living and that he could take pills to end his life, there is no evidence that his life was in imminent jeopardy.  *Cf. McKenney*, 2010 WL 560891, at *7-8 (officer tasered man who appeared to be moving rapidly towards second story window).  In addition, only a short time elapsed between Officer Larsen's involvement in the encounter and the use of his taser.  Notably, Officer Larson used the taser shortly after Officer Wychor had reassured Van Raden that they did not intend to use it.  Moreover, while Defendants assert that Van Raden kicked at the Officers when they were attempting to lift him from the chair, whether Van Raden kicked is a disputed fact issue for the jury to resolve.  If the jury were to conclude that Van Raden was not kicking at the Officers or that Van Raden's actions were not sufficiently threatening to make the Officers reasonably fear for their safety, then the jury could also reasonably conclude that the use of the taser was unreasonable.[11]  Therefore, a reasonable juror could conclude that Van Raden's constitutional rights were violated.

---

[10]     The record shows that there was a sword lying on a desk in the same room as Van Raden and the Officers.  However, the evidence also shows that Officer Wychor was standing between Van Raden and the desk on which the sword was lying, and there is no evidence that Van Raden ever attempted to reach for the sword.

[11]     Defendants argue that it was reasonable for Officer Larson to use the taser on Van Raden because had the Officers not subdued him, Van Raden could be dead, presumably by suicide.  The Court acknowledges that there are situations where Officers are entitled to use force to subdue a suicidal individual.  However, here, the jury will have to determine whether it was reasonable to believe that Van Raden, in resisting being moved from his chair, was imminently likely to injure himself.

While not directly on point, the facts of *Brown* are sufficiently aligned to make the holding instructive here. First, Van Raden was not being detained for committing a crime. Moreover, like the plaintiff in *Brown*, Van Raden was not fleeing or acting violently towards the Officers. And while Van Raden could be fairly characterized as "resisting"—by, for example, refusing to leave his house or get out of his chair—he was in an obvious state of mental distress and was asking to be left alone.[12] The Eighth Circuit has determined that "non-violent, non-fleeing subjects have a clearly established right to be free from the use of tasers." *De Boise*, 760 F.3d at 897 (citing *Brown*). With this in mind, the Court concludes that a reasonable juror could conclude that Van Raden was a "non-violent, non-fleeing subject" and therefore that he had a clearly established right to be free from the use of tasers. Accordingly, the Court denies Defendants' motion for summary judgment as to Van Raden's excessive force claim against Officer Larsen.

The Court also denies Van Raden's motion for summary judgment on his excessive force claim against Officer Larsen. If, for example, the jury were to decide that Van Raden aggressively kicked at the Officers so as to cause them to fear for their safety or fear that the situation could spiral out of control, then ultimately a jury could determine that the use of the taser was reasonable.

---

[12] These facts are distinguishable from the facts of *De Boise*, where the officers heard the plaintiff, who was delusional, being physically aggressive inside his house (breaking glass, throwing furniture, etc.), and who refused repeated requests to stay on the ground by jumping to his feet and confronting the police.

### C. Deliberate Indifference to Medical Needs

Van Raden asserts that the Officers violated his right to medical assistance. In particular, Van Raden argues that the Officers were aware of Van Raden's various medical issues, that he was elderly, and that he warned them that a shock from a taser could kill him. After being tasered, Van Raden complained of heart pain, and was unable to stand or walk. Van Raden asserts that a reasonable person would have inferred that he needed medical attention. Van Raden also claims that the Officers, instead, mocked him by telling him to stand up and walk outside to the waiting ambulance.

Because Van Raden was being detained pretrial, Van Raden's claim is analyzed under the Fourteenth Amendment. *Kahle v. Leonard*, 477 F.3d 544, 550 (8th Cir. 2007). However, application of the Eighth Amendment deliberate indifference standard is appropriate. *See id*. at 550 ("Pretrial detainees are entitled to the same protection under the Fourteenth Amendment as imprisoned convicts receive under the Eighth Amendment."). The law recognizes deliberate indifference to a prisoner's serious medical needs under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To establish a constitutional violation based on deliberate indifference to medical needs, Van Raden must demonstrate that: (1) he suffered from an objectively serious medical need; and (2) that the Defendants knew of the need and deliberately disregarded it. *Id*. at 106. Deliberate indifference requires proof of a reckless disregard of a known risk. *Coleman v. Parkman*, 349 F.3d 534, 539 (8th Cir. 2003). A serious medical need is one that has been diagnosed by a physician as requiring treatment or one that is so

obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997). In addition, when considering a claim for the denial of medical assistance under the Eighth Amendment, the Court also looks at the effect of a delay in medical treatment. *Id.* at 784.

Here, Van Raden argues that he suffered from a serious medical need after being tasered because he collapsed to the floor and suffered severe pain. Van Raden also argues that by requesting that Van Raden get up and walk to the ambulance before putting Van Raden onto a backboard, the Officers unreasonably delayed his medical care.

The Court concludes that Van Raden has not submitted sufficient evidence to convince a reasonable juror that he was suffering from an objectively serious medical need after being tasered or that any need for medical care was deliberately disregarded. While clearly in pain after being tasered, Van Raden has not pointed to anything in the record to demonstrate that his injuries were serious enough to establish an Eighth Amendment violation. In addition, Van Raden has not pointed to record evidence to show any detrimental effect of any delay in his medical treatment. Indeed, the record shows that the Officers placed Van Raden on a backboard and transported him into the ambulance shortly after he was tasered. Therefore, even viewing the facts in the light most favorable to Van Raden, the Court finds that no reasonable juror could conclude that Van Raden was denied medical care in violation of his constitutional rights. Accordingly, Van Raden's claim for denial of medical treatment fails and Count Two is dismissed.

# ORDER

Based upon the foregoing, and the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion for Summary Judgment (Doc. No. [12]) is **DENIED**.

2. Defendants' Motion for Summary Judgment (Doc. No. [26]) is **GRANTED IN PART** and **DENIED IN PART** as follows:

   a. Counts Two and Three are **DISMISSED WITH PREJUDICE**.

   b. Count One is **DISMISSED WITH PREJUDICE** as it is asserted against Officers Wychor and Birmingham.

   c. Count One, as it is asserted against Officer Larsen, remains.


Dated:  February 26, 2015             s/Donovan W. Frank
                                      DONOVAN W. FRANK
                                      United States District Judge